UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| THE GENTLE WIND PROJECT, *et al.*,<br><br>  Plaintiffs<br><br>v.<br><br>JUDY GARVEY, *et al.*,<br><br>  Defendants | Civil No. 04-103-P-C |

Gene Carter, Senior District Judge

### ORDER GRANTING DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT ON RICO CLAIM (COUNT I)

In this action, Plaintiffs seek monetary and injunctive relief stemming from the publication of statements via the internet, which they assert are false, defamatory, and fraudulent. Judy Garvey and James Bergin are the only remaining Defendants in this action.[1] Count I of Plaintiffs' Amended Complaint alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. § 1962(c). Plaintiffs allege that Defendants engaged in a pattern of racketeering consisting of violations of 18 U.S.C. § 1343. Counts III through VII are claims arising under state law.[2] Defendants have counterclaimed, alleging similar violations of state law. For the

---

[1] Although original Defendant Ian Mander has defaulted, the Court has withheld consideration of Plaintiffs' Motion for Entry of Default Judgment pending resolution of the claims against the remaining defendants.

[2] Count II of the Amended Complaint has been dismissed.

reasons stated below, the Court will grant Defendants' Motion for Summary Judgment as to Count I, and, declining to exercise supplemental jurisdiction, will dismiss the parties' remaining claims without prejudice.

## I.  Factual and Procedural History

The Court views the record on summary judgment in the light most favorable to the nonmovant. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000). The summary judgment record supports the following relevant facts.[3]

Defendants James Bergin and Judy Garvey are husband and wife. For several years, the couple was involved with the Gentle Wind Project (hereinafter "GWP"), an organization holding non-profit status under Maine law. GWP asserts that it is "dedicated to education and research aimed at alleviated [sic] emotional and mental human suffering and trauma." Plaintiffs' Opposing Statement of Material Facts (hereinafter "Plaintiffs' SMF") at ¶1. The individual plaintiffs are employees, staff and/or directors of GWP.

In the course of fulfilling the mission of GWP, Plaintiffs manufacture items which they describe as "healing instruments that are designed to restore human beings to a natural state of existence." *Id*. at ¶ 4. Plaintiffs' designs for these instruments, at least in part, are believed to "come from the Spirit World." Sealed Deposition of John Miller, p. 83 line 17, attached as exhibit 3 to Defendants' Statement of Material Facts (hereinafter "Defendants' SMF") (Docket Item No. 107). Plaintiffs make these instruments available

---

[3] Plaintiffs' argument that certain facts should be deemed admitted because Defendants failed to respond to allegations in the Amended Complaint is without merit. *See* Plaintiffs' Opposing Statement of Material Facts (Docket Item No. 120) at 9. Defendants' Answer contained a general denial of those allegations and, thus, provided an adequate response pursuant to Fed. R. Civ. P. 8(b). *See* Defendants' Answer to Amended Complaint (Docket Item No. 92) at 1, n.2.

to the public for a requested amount of money, which they describe as a donation. Plaintiffs' SMF at ¶ 9.

The record shows that in May of 2003, Defendant Garvey contacted Ivan Fraser, host of a website called "The Truth Campaign." In an e-mail message, Garvey communicated to Fraser that she was a former member of GWP and interested in reading an article relating to GWP published by the Truth Campaign. In that message, Garvey also informed Fraser that there were "[s]everal of us…in the process of introducing the public to the problems of this group." Exhibit J, GB 955 (attached to Plaintiffs' SMF). Fraser appears to have responded by sending the requested articles. Fraser also sent a copy of Garvey's e-mail and his response to Steven Gamble. Steven Gamble resides in the United Kingdom and operates a website for something called "Equilibra."

In October or November of 2003, Garvey authored a document entitled "Insiders' Stories." Insiders' Stories purports to describe the experience of several former members of GWP. The document describes "energy work," consisting of group sex rituals undertaken between GWP's leader and other members, which were allegedly required for creation of GWP's instruments. Insiders' Stories also characterizes GWP as a cult. The Defendants published the document at www.windofchanges.org, a website that they developed. Both Gamble and Fraser provided links on their websites to the wind of changes website. In addition, Garvey sent Insiders' Stories to Steven Hassan, who posted the document on his website called "Freedom of Mind."

Further communications between Fraser, Gamble, and Garvey coincided with responses to Insiders' Stories. The record shows that following publication of Insiders' Stories, in December of 2003, Fraser received an anonymous e-mail message from

3

someone claiming to be a friend of Garvey's.  Fraser believed the message to be a veiled threat, and forwarded the message to Garvey, asking if she had any thoughts about the individual who wrote it.  Exhibit J, GB 959.  Garvey replied, sharing with Fraser and Gamble her opinion of who wrote the message and why.  Exhibit J, GB 1214.  Garvey also gave Fraser some information about how he may respond to the person.  Exhibit J, GB 1218.  ("It's probably best if you don't address her as Nancy, if she writes back (which she probably won't).  But this will give you some insights.").

Fraser, Gamble, and Garvey also communicated regarding changes on GWP's website.  GWP posted numerous statements on its website, apparently reacting to the allegations made in Insiders' Stories.  In their e-mails, Fraser, Gamble, and Garvey generally discussed the content of the GWP postings and expressed their reactions to them.  One particular set of e-mails discloses that both Garvey and Gamble were having difficulty "copying and pasting" the information on the GWP site.  *See* Exhibit J, GB 965, 1240.  Fraser responded by informing them of a method by which he had been able to do so.  Exhibit J, GB 967.  Another group of e-mails contains discussion regarding reports that Garvey was receiving about GWP "harassing" other former members.  Exhibit J, GB 93.

Some time after publication of Insiders' Stories, Bergin authored a document entitled "A Husband's Perspective."  Defendants' SMF at ¶ 15.  The document describes what Bergin contends was his experience and perspective of the relationship that he and his wife had with GWP.  A Husband's Perspective reiterated Garvey's claim that GWP members engage in sexual rituals, and also characterized GWP as a cult.  Bergin authored the document with the assistance of Garvey and a former member of GWP known as

"Tug." Although the record indicates that Fraser and Gamble were asked to share any comments or suggestions that they had regarding A Husband's Perspective, there is no evidence that they in fact made any substantive contribution to Bergin's work. As with Insiders' Stories, A Husband's Perspective was published at www.windofchanges.com and posted on the Freedom of Mind website operated by Hassan.

Sometime in February of 2004, a website called "New Zealand Cult List," co-edited by Ian Mander, posted links to Insiders' Stories and A Husband's Perspective. That same month Garvey and Bergin contacted Rick Ross, operator of the Rick A. Ross Institute for the Study of Destructive Cults, Controversial Groups and Movements. They informed Ross of their long relationship with GWP, directed him to the documents they had published, and gave permission for their accounts to be included on his website. Ross subsequently posted on his website reviews of the documents as well as links for viewing them.

Around this same time, February, 2004, Hassan received a letter from an attorney, purportedly on behalf of GWP, regarding the content of his website. In response, Garvey wrote an e-mail to Hassan stating "Jim and I would like to say that we are ready to make statements or to act legally if need be in the future, on our behalf or yours. The lawyer might be told, if you wish, that the words are all Jim and mine [sic], rather than yours, and that we stand by every one of them." Exhibit J, GB 1293. Throughout this time, Fraser, Gamble, and Garvey continued to communicate via e-mail regarding the content of GWP's website and references which they believed were to them. In April, 2004, Ross, Gamble, and the Defendants received letters similar to the one received by Hassan. E-mails were again exchanged, commenting on the letters and GWP's actions.

In May of 2004, Defendant Garvey researched transactions relating to GWP's property. Garvey e-mailed the results of her research to Gamble and Fraser. Although Gamble and Fraser responded with comments regarding what Garvey had found, there is nothing in the record demonstrating that they otherwise assisted her in compiling the information or made use of the information she provided. Garvey apparently sent packets of the information to various law enforcement agencies, including the Internal Revenue Service and the Maine Attorney General.

Plaintiffs filed this suit on May 18, 2004, naming Garvey, Bergin, Gamble, Fraser, Ross, Hassan, and Mander as Defendants[4] (hereinafter "the originally named defendants"). Following commencement of the suit, Garvey and Bergin contacted an organization, apparently known as SIA, and requested assistance with the lawsuit filed by GWP. SIA subsequently provided some general legal information and offered to conduct an investigation into GWP. Although Defendants have continued to exchange e-mails with the other originally named defendants since commencement of the suit, the record does not demonstrate any involvement between SIA and the other originally named defendants.

Plaintiffs have voluntarily dismissed Hassan, Gamble, and Fraser from this suit. The Court has dismissed Ross for a lack of subject matter jurisdiction. Although Mander has defaulted, the Court has reserved entry of default judgment pending resolution of the action against the remaining defendants.

---

[4] The Amended Complaint also named as defendants J.F. Bergin Company, Equilibra, The Truth Campaign, and Rick A. Ross Institute for the Study of Destructive Cults, Controversial Groups and Movements. Each has been dismissed from this action. For purposes of the Court's enterprise analysis, the individual defendants are indistinguishable from these "entity" defendants on whose behalf they acted. *See Bachman v. Bear Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999) (Posner, C.J.) ("We have described the alleged RICO enterprise as [the individual Defendants], thus leaving out the four corporations. This was deliberate…To add the corporations to [the individual Defendants], their employees, is…to add nothing.").

## II. Standard of Review

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). "A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *De-Jesus-Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841-42 (1st Cir. 1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995)).

## III. Discussion

In order to prevail on their RICO claim, Plaintiffs bear the burden of proving four elements: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995). The statute provides that the term enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "There are, therefore, two types of enterprises: legal

entities and associations-in-fact." *Libertad*, 53 F.3d at 441.  Defendants argue that summary judgment should be granted because no genuine issue of material fact exists as to the existence of an enterprise.[5]  Plaintiffs oppose the motion, arguing that the originally named defendants constituted an "association-in-fact enterprise."

In *United States v. Turkette*, 452 U.S. 576, 583 (1981), the Supreme Court set out the test for an association-in-fact enterprise, requiring "evidence of [(1)] an ongoing organization, formal or informal, and…[(2)] evidence that the various associates function as a continuous unit."  Some circuits have further refined the Supreme Court's *Turkette* test to require proof that the enterprise have an "ascertainable structure."  *See, e.g.*, *Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996); *United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982).  Although the First Circuit has rejected the "ascertainable structure" test, *see United States v. Patrick*, 248 F.3d 11, 18 (1st Cir. 2001), it has recognized the "important concept" underlying the test, specifically, that the RICO statute requires proof of "both an 'enterprise' and a 'pattern of racketeering activity,'" *id*.

While it is clear that proof of an ascertainable structure is not required in this circuit, it remains somewhat unclear what attributes are required to make an association of persons qualify as an "enterprise."  Although *Turkette* mandates proof that the enterprise be an "ongoing organization" and "function as a continuing unit," it is difficult to discern precisely what level of organization and continuity is required.  At a minimum, however, the enterprise must be sufficiently organized and continuous such that it exists

---

[5] Oddly, Plaintiffs assert that Defendants have not "directly challenge[d] the allegation that they were associated-in-fact with the other Defendants in the case for purposes of RICO's 'enterprise' requirement."  Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Docket Item No. 121) at 5.  This is not correct.  Defendants argue that "the undisputed facts do not support the existence of an enterprise separate from the alleged pattern of racketeering."  *See* Defendants' Motion for Summary Judgment on RICO Count (Docket Item No. 106) at 9-16.

as an "entity" distinct from the individual defendant. *See Cedric Kushner Promotions, LTD, v. King*, 533 U.S. 158, 162 (2001).

The record demonstrates that the originally named defendants never acted as an organized "entity." Clearly, there was no formal organization. No individual took the role of leader. The group never conducted meetings or raised money. The evidence also discloses that they were not organized, even in an informal manner. Each maintained their own websites. None shared control of the content of their websites with other members of the alleged enterprise. While several of them used content provided by others, they did so only after receiving permission to do so. Exhibit J, GB 1248.

Also unlike an organized entity, there was no division of responsibilities. There is no evidence that any of the original defendants were responsible for any specific tasks or fulfilled any particular role. While an "enterprise" need not be so formal as to "observe the niceties of a legitimate organization[]," *Patrick*, 248 F.3d at 19, it must show some characteristics of an organization, *see Turkette*, 452 U.S. at 583. Here, aside from their common interest and purpose, there was nothing binding the original defendants together such that a reasonable person could conclude that they were an organized entity.

As support for their contention that a genuine issue of material fact remains as to the existence of an enterprise, Plaintiffs rely primarily upon the number of e-mail messages sent among the members of the group. While Plaintiffs correctly argue that "sharing information among group members is an activity that tends toward finding an association-in-fact enterprise," Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Docket Item No. 121) at 11, that fact alone is insufficient to prove an association-in-fact RICO enterprise. *See Turkette*, 452 U.S. at 583. Whether a

9

reasonable jury could infer the existence of such an enterprise requires consideration of the information being shared and how it was used; in other words, whether the communications were consistent with an entity demonstrating ongoing organization and continued coordination. *See id*.

Although Plaintiffs assert that through these communications the associates continually assisted each other, the record paints a different picture. The e-mails relied upon by Plaintiffs reveal very few instances where the information being shared was in fact put to some use. There is no evidence that any of the members of the alleged enterprise, aside from Garvey and Bergin, provided meaningful assistance in the creation of Insiders' Stories or A Husband's Perspective. Furthermore, a careful review of the e-mails reveals that many involve matters entirely unrelated to GWP, such as cordial greetings and discussions of politics. Consequently, neither the content of the communications nor their use lend any support to Plaintiffs' contention.

Furthermore, even in those few instances where the information being shared was put to some use, the record demonstrates that it was on an *ad hoc*, rather than coordinated, basis. For instance, on one occasion, when Hassan received what he believed was a veiled threat responding to his posting of Insiders' Stories, he asked for, and received, information and advice from Garvey on how to respond. On another instance Fraser informed Garvey and Gamble of how they could solve their "copy and paste" problems. While these instances of the members of the group providing assistance to each other are similar in that they relate to GWP, they are so dissimilar that one could not reasonably infer any pattern to that assistance. In other words, the assistance and communication between the members of the alleged enterprise reflects that they shared

common interests, but offers no proof of *ongoing* organization or coordination. *See Patrick*, 248 F.3d at 19 (rejecting requested instruction because it failed to address "the ongoing nature of the enterprise"); *see also Bachman v. Bear Stearns & Co., Inc.*, 178 F.3d 930, 932 (7th Cir. 1999) (Posner, C.J.) (concluding that no enterprise existed because "the duration here was a function not of there being an organization able to hold itself together through time, but merely of the nature of the fraud"). This conclusion is supported by the lack of any evidence that the group expected future cooperation from each other. There is no evidence of a "plan." The e-mails contained in the record were not replied to on any discernable schedule. To the extent that the participants were "organized" for some discrete tasks, it cannot be said that they remained so on an ongoing or continued basis.

Review of recent RICO cases, in which the First Circuit Court of Appeals has found sufficient evidence of an enterprise, provides further support for Defendants' position. *See United States v. Cianci*, 378 F.3d 71, 85 (1st Cir. 2004) (upholding jury's finding of enterprise where evidence showed that "there existed an organized structure with [the Defendant] at the top, [another member] as a middle man facilitating and often initiating transactions, and others…that fed deals into the organization"); *Patrick*, 248 F.3d at 19 (finding sufficient evidence of enterprise where "[gang] changed its name from Adidas to IVP, it had colors and signs, it had older members who instructed younger ones, its members referred to the gang as family, and it had 'sessions' where important decisions were made."); *Libertad*, 53 F.3d at 444 (holding that there was sufficient evidence of an enterprise where the record included "highly competent evidence that two groups [comprising the alleged enterprise] are connected in a somewhat formal sense,

and that they share common leaders or organizers"). None of these cases have permitted a finding of a RICO enterprise based solely upon the sharing of information and a few, *ad hoc*, coordinated activities. Plaintiffs have failed to identify, and the Court has been unable to discover, any cases in which RICO liability has been premised upon the type of interaction presented by this record.

Finally, the deficiency in Plaintiffs' RICO claim is crystallized by comparison to the purpose and role of the enterprise element in the RICO statute. The Supreme Court has held that RICO is intended to prevent enterprises from serving as either the "victim" or the "vehicle" of racketeers. *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994). From the facts presented in this record, no reasonable person could conclude that Defendants' either used an association as a vehicle for any racketeering activities or, that by engaging in such racketeering activities, they victimized an association to which they were members. The relationships evidenced by the record are simply not the type to which RICO applies. *See id*. Accordingly, Defendants are entitled to summary judgment on Count I of the Amended Complaint.

### IV.   State Law Claims

In the absence of any remaining federal claims, the Court must next determine whether to exercise supplemental jurisdiction over the parties' state law claims. *See* 28 U.S.C. § 1367(c)(3) (expressly authorizing a district court to decline the exercise of supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Rodriguez v.*

*Doral Mortg. Corp.,* 57 F.3d 1168, 1177 (1st Cir. 1995) ("[a]s a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims"); *Snowden v. Millinocket Reg'l Hosp.,* 727 F. Supp. 701, 710 (D. Me. 1990) (the *Gibbs* doctrine "require[s] dismissal without action on the merits…if all the federal claims in this suit are found to be, short of trial, deficient.").

In accordance with the discretion afforded to the Court under 28 U.S.C. § 1367(c)(3), the Court is of the view that the most appropriate course of action is to decline to exercise supplemental jurisdiction. Accordingly, the Court will dismiss the parties' remaining claims without prejudice. The parties may, if they choose, refile those claims in the forum best suited to resolve them. *See Carey v. MSAD # 17,* 754 F. Supp. 906, 927 (D. Me. 1990).

V.     Conclusion

For the reasons set forth above, it is **ORDERED** that Defendants' Motion for Summary Judgment be, and it is hereby, **GRANTED** as to Count I. There being no independent basis of federal jurisdiction over the case, it is **FURTHER ORDERED** that Defendants' Counterclaim and Counts III through VII of Plaintiffs' Amended Complaint be, and they are hereby, **DISMISSED** without prejudice.

/s/Gene Carter_____
**GENE CARTER**
Senior United States District Judge

Dated at Portland, Maine this 3rd day of January, 2006.